IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| TERRY L. FREDERICK and<br>DONNA F. FREDERICK,<br><br>            Plaintiff,<br><br>v.<br><br>SWIFT TRANSPORTATION CO., INC.,<br>and ROBYN L. GETCHEL,<br><br>            Defendant. | )<br>)<br>)<br>)  **CIVIL ACTION**<br>)<br>)  No. 06-1332-MLB<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM AND ORDER**

Before the court is Swift Transportation Co., Inc.'s ("Swift") motion to exclude the testimony of Terry and Donna Fredericks' ("Fredericks") expert, Dr. Kris Sperry, M.D. (Docs. 125, 126). A response and a reply have been filed. (Docs. 152, 172). Swift's motion is DENIED for the reasons stated more fully herein.

**I. FACTS**

This is a personal injury action arising out of a tractor-trailer collision. Fredericks have asserted several claims including: 1) Swift's employee Getchel negligently caused the accident while employed with Swift and acting within the course and scope of her employment; 2) Getchel was negligent per se in that she violated N.M.S.A. § 66-8-102 and 49 C.F.R. § 382.213; and 3) Swift was negligent in hiring, training, and supervising Getchel. Fredericks hired an expert, Kris Sperry, M.D., who prepared a written report setting forth his opinions regarding the post-accident urine test performed on Getchel, which was positive for methamphetamine and amphetamine. (Doc. 152, exh. 29). Dr. Sperry was extensively deposed

on March 19, 2008. By its motion, Swift seeks to exclude Dr. Sperry's opinions. In reaching its decision, the court has considered Fed. R. Evid. 403, 702 and 703, Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) and applicable Tenth Circuit decisions. On August 18, 2008, the court heard the testimony of Dr. Sperry as contemplated by Goebel v. Denver and Rio Grande Western Railroad Company, 215 F.3d 1083, 1087 (10th Cir. 2000) and Tuato v. Brown, 85 Fed. Appx. 674, 2003 WL 23032371 (10th Cir. Dec. 30, 2003). **II. STANDARDS**

"Rule 702 sets forth the standard for admission of expert testimony," U.S. v. Fredette, 315 F.3d 1235, 1239 (10th Cir. 2003), and assigns "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993). Rule 702 provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The standards embraced by Rule 702 and Daubert apply equally to scientific testimony and other testimony of a technical nature. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 , 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999). A party offering an expert witness bears "the burden of demonstrating to the district court that [the proffered expert is] qualified to render an

expert opinion." United States v. Nacchio, 519 F.3d 1140, 1171-72 (10th Cir. 2008); see also Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 (10th Cir. 2001). Still, the court's "gatekeeping" role favors admissibility of expert testimony when it is reliable and relevant. Burton v. R.J. Reynolds Tobacco Company, 183 F. Supp. 2d 1308, 1311 (D. Kan. 2002). Any issue of credibility or weight of the expert's testimony belongs to the trier of fact.

"To fulfill its gatekeeping role, a district court must therefore conduct a two-part inquiry.  First, a district court must determine if the expert's proffered testimony ... has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1232-33 (10th Cir. 2004) (quoting Daubert, 509 U.S. at 592.). This first step includes reviewing the scientific validity behind the expert's reasoning and methodology. Id. at 1233. The court may consider, among others, the following four factors: "(1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has 'general acceptance.' Id. Second, in fulfilling its Daubert obligations a trial court must also conduct a further inquiry into whether proposed testimony is sufficiently 'relevant to the task at hand[,]'" that is the expert's opinion is material and will assist the trier of fact. Id. at 1234.

**III. ANALYSIS**

**A. Dr. Sperry's Qualifications**

The record indicates that Dr. Sperry is well qualified to testify

-3-

about the urine analysis and the toxicology report done on Getchel. Dr. Sperry graduated from the University of Kansas School of Medicine in 1978. He completed a residency in pathology and a fellowship in forensic pathology. Dr. Sperry moved to Georgia and began working as a forensic pathologist at the Fulton County Medical Office. Currently, Dr. Sperry is Chief Medical Examiner for the State of Georgia and has held that title for over eleven years. Dr. Sperry is board certified and has testified in court approximately 624 times.

In his professional capacity, Dr. Sperry frequently examines toxicology reports as they are relevant in determining the possibility of a crime or cause of death in numerous situations. Specifically, Dr. Sperry orders toxicology tests to be performed and subsequently interprets the results from those tests, which later factor into his conclusions. Dr. Sperry has "education, training, experience and expertise in the area of alcohol and illegal drug use and how alcohol and illegal drugs effect the central nervous system and other organic systems of the body including known physical, cognitive, emotional and behavioral reactions caused by alcohol and drug use, including amphetamines and methamphetamine." (Doc. 152, exh. 28). Significantly, Swift is not disputing that Dr. Sperry is qualified as an expert to interpret and give his opinion about Getchel's toxicology tests.[1] Nor is Swift disputing the fact that methamphetamine was

---

[1] Although Swift questioned Dr. Sperry about his lack of experience in examining cases where the sole focus was methamphetamine, Swift told the court during the Daubert hearing that Dr. Sperry's qualifications as an expert were not in issue.

-4-

present in Getchel's urine.[2]  Swift, however, raises two issues: 1) that Dr. Sperry's opinion is unreliable and irrelevant; and 2) that the presence of methamphetamine in Getchel's urine does not automatically establish that methamphetamine was present in her blood.

**B. Methodology**

Dr. Sperry testified that in formulating his opinion, he applied the same basic methodology that he uses everyday in his professional capacity as Chief Medical Examiner for the State of Georgia.  Dr. Sperry explained that when faced with a toxicology issue, forensic pathologists incorporate studies that show how various drugs absorb, metabolize, break down, and leave the body as well as the effects these drugs have on the human body.  It is the cumulative nature of medical and scientific literature that suggest what drug is present and how it affects the blood.  These studies provide the scientific foundational basis on which experts rely and formulate opinions. All drugs ingested into the body have distinct half lives[3], that is all drugs metabolize and are eliminated in varying ways.  Specifically, Dr. Sperry utilized methods explained in Steven B. Karch's second edition of the Drug Abuse Handbook and Randall C. Baselt's seventh edition of Disposition of Toxic Drugs and Chemicals in Man.  (Doc.

---

[2]Type D-methamphetamine was found in Getchel's urine sample, which is the form that is highly addictive and chemically causes the deleterious effect on humans.

[3]A "half-life" is the amount of time in which one-half of the quantity of a substance in the body will be naturally eliminated. See Merriam Webster's Medical Desk Dictionary 321 (1996); The Merck Manual 2612 (16th ed. 1992).

152, exhs. 32, 33). These materials incorporate and summarize scientific studies that have been peer reviewed. Dr. Sperry did not know of any exception to these types of studies and stated this methodology is generally accepted by other experts in the field. Swift did not provide any evidence to the contrary.

Dr. Sperry went on to explain that he applied these generally accepted principles to the facts of this case. Dr. Sperry relied on a certified copy of the LabOne Substance Abuse Testing Documentation Packet, which was generated from the post-accident urine sample taken from Getchel. Dr. Sperry discovered no errors in the test and made a general assumption that LabOne's rules and regulations governing the test were appropriate. Dr. Sperry highlighted the fact that both a drug screening test and a drug confirmatory test were used. A screening test is a broad test that is used to capture or detect broadly the presence of drugs, but does not truly confirm that a specific drug is present. The conformity test, however, is used to prove which drug is present in that it specifically looks for a certain drug, measures the quantity of that drug, and excludes any other type of drug. Dr. Sperry noted that the level of drugs in Getchel's system were above the screening test's requisite cutoff levels[4] and that LabOne utilized the gas chromatography-mass

---

[4]Dr Sperry testified that false positives may show up on a screening test. Cutoff levels have been developed because it is very costly to detect the presence of a specific amount of drugs. Additionally, when the drug level gets too low (i.e., there is a tiny amount of drugs present in the subject's system), there is a much greater probability that these are false positives and not really drugs. Once the drug presence is above the cutoff level, however, then the likelihood of drugs is higher. Experts give great weight and reliability, almost 100%, to a screen test above cutoff level.

spectrometry method in performing the conformity test, which is used in every toxicology lab.

Dr. Sperry also looked at how the urine sample was obtained and the Department of Transportation ("DOT") regulations, all of which were valid methodology. DOT regulations require that a urine sample be taken within 32 hours following an accident. In this case, Getchel's urine sample was taken approximately 11 hours, 45 minutes after the accident. The toxicology report indicated there was an amphetamine quantity of 711 NG/ML and a methamphetamine quantity of 2236 NG/ML or 2.236 MG/L in Getchel's urine sample. Taking into account the LabOne report and various scientific literature, Dr. Sperry concluded that Getchel had ingested a 10 MG dose of methamphetamine within 24 hours prior to her urine sample being taken.

As a result of his conclusions, Dr. Sperry opined that Getchel had ingested methamphetamine prior to the accident and was operating under a physiological or psychological impairment[5] while she was driving the tractor-trailer on March 16, 2006. Dr. Sperry explained that no scientific study has ever determined a safe level of methamphetamine in a human's blood such that a person may operate a motor vehicle without any impairment to his or her central nervous system after ingesting methamphetamine.[6] While it is true that the rate of impairment differs depending on the dose-dependent or

---

[5] Types of impairments include alterations in judgment or perception, restlessness, and confusion.

[6] According to Dr. Sperry, there is no recognized safe level or acceptable level of methamphetamine that is acceptable within operation of motor vehicles because the drug affects the brain and driving a motor vehicle is a complex task.

experience-dependent of each person, any level would affect a person's brain. According to Dr. Sperry, the effects of ingesting methamphetamine are unpredictable, but unavoidable.

**C. Reliability**

Swift argues that Dr. Sperry's opinions are not reliable or relevant. First, Swift asserts that Dr. Sperry's opinions are not reliable because he is not certain as to the quantity of methamphetamine in Getchel's blood at the time of the accident or the level of impairment Getchel was operating under. The only quantity Dr. Sperry is certain of is the amount of methamphetamine found in Getchel's urine.

The First Circuit considered a situation quite similar to the case at hand. Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77 (1st Cir. 1998). In Ruiz-Troche, the court found that the district court erred in excluding expert testimony of the amount of cocaine Ruiz consumed and the level of impairment Ruiz experienced. Id. at 85 (noting that the district court "set the bar too high."). The expert in Ruiz-Troche arrived at his opinions by interpolation from the toxicology results and half-life methodology. Id. at 80. Even though the plaintiffs pointed to weaknesses in the expert's methodology, the court found that the half-life method and scientific studies used by the expert were sufficiently reliable, thus meeting the Daubert standards. Id. at 85 (finding that the "[expert]'s technique has been subjected to, and survived, the rigors of testing, publication, and peer review, and it appears to have won significant (if not universal) acceptance within the scientific community.").

Another issue addressed by Ruiz-Troche was the level of

-8-

scientific certainty required for an expert in order for his or her opinion to be admissible. Id. The district court erred when it excluded the expert's impairment testimony because he could not "declare [what] precise quantity of cocaine in the bloodstream produces an equally precise degree of impairment." Id. at 86. The circuit found that "[t]his requirement solicits a level of assurance that science realistically cannot achieve and that Daubert does not demand. [Citations omitted]. The adoption of such a standard impermissibly changes the trial judge's role under Daubert from that of gatekeeper to that of armed guard. That mistaken application of the law likewise constitutes an abuse of discretion." Id.

The court finds that the methods used by Dr. Sperry are reliable and were appropriately applied to the facts in this case. It is true that Dr. Sperry could not quantify the amount of methamphetamine in Getchel's blood or state with specificity the alleged impairments Getchel was operating under at the time of the accident. Still, Dr. Sperry testified that if methamphetamine was found in Getchel's urine, then methamphetamine was first present in her blood in order for her kidneys to filter methamphetamine into her urine.[7] The weaknesses in an expert's reasoning is an issue for the jury that Swift may point out on cross examination. Id. at 85.

Second, Swift claims that Dr. Sperry is relying on new materials,

---

[7] Dr. Sperry explained that methamphetamine does not metabolize or break down into an inactive drug other than small amounts of amphetamine. Methamphetamine is filtered directly by the kidneys into the urine. As a result, methamphetamine will be detected several hours later because its half life is slow and is not broken down into a byproduct. Methamphetamine has an average half life of 10 hours and takes about 50 hours to completely leave the body.

-9-

not previously considered when he made his report, for the basis of his opinions. Dr. Sperry testified, however, that the new materials he brought to the Daubert hearing were not studies he relied on, but were explanatory literature to aid the court in its determination on the admissibility of his opinion. For the reasons stated at the hearing, the court finds this does not amount to "sand-bagging."

Third, Swift asserts that Dr. Sperry gave inconsistent answers in the Daubert hearing from those given during his deposition. Swift asked the following questions at Dr. Sperry's deposition:

> Q. All you can really say is what amount of metabolites were in the driver's urine some ten hours after the accident, true?
>
> A. Yes, that is the one thing that can be -- that I would say with certainty. That's the one thing that can be said.
>
> Q. As you sit here today, you are unable to testify, to a reasonable degree of medical certainty, how much, if any, methamphetamine blood level was in Robyn Getchel's blood at the time of the accident, correct?
>
> A. Correct.
>
> Q. You are also unable to testify that if Robyn Getchel did have methamphetamine in her bloodstream, at what level that the drug would impair her driving ability. Do you agree?
>
> A. Yes. (Doc. 152, exh. 30).

Swift argues that these answers, among others, show Dr. Sperry cannot provide a reliable opinion. According to his answers, Dr. Sperry could not tell what level of methamphetamine or its metabolites were in Getchel's blood at the time of the accident. Nor could Dr. Sperry predict what level of impairment Getchel was operating under.

At the Daubert hearing, in response to Swift's allegations, Dr. Sperry stated he always held the opinion that there was methamphetamine in Getchel's blood. He stated this same opinion in

-10-

his report, at the end of his deposition, and once again at the Daubert hearing. Dr. Sperry explained that he "did not hear the two word nuance, if any," when asked about what level of methamphetamine was in Getchel's blood. According to Dr. Sperry, while he may have erred at the deposition, his present opinion, that Getchel had methamphetamine in her blood, is consistent with his report. The credibility of an expert witness is an issue for the jury and Swift may properly address these inconsistent statements on cross examination.

Swift also asked Dr. Sperry if Getchel's drug test would have resulted in the same conclusion if she ingested methamphetamine after the accident, but before the urine test. Dr. Sperry answered affirmatively. However, Swift has not pointed to any evidence that Getchel took methamphetamine after the accident. This is another matter for trial, assuming Swift can lay a foundation.

### D. Relevancy

Swift argues that Dr. Sperry's opinion is irrelevant because it is not based on any facts taken from this case. Dr. Sperry did not rely on any police reports or depositions from other witnesses. Dr. Sperry was not present at the accident and cannot testify as to whether Getchel was actually impaired by methamphetamine. Due to Dr. Sperry's lack of personal knowledge and limited reliance on the facts surrounding the accident, Swift claims that Dr. Sperry's opinions are "speculative and unsupported at best." (Doc. 126 at 19).

The court finds that there is a factual basis for Dr. Sperry's opinions. Swift fails to take into account the fact that Dr. Sperry relied on the LabOne report, which tested the post-accident urine

sample taken from Getchel. Getchel's toxicology report tested positive for methamphetamine and amphetamine. Dr. Sperry then applied the proper methodologies to interpret the results from Getchel's toxicology report. Therefore, Dr. Sperry's opinions do incorporate the facts in a reliable fashion.

**E. Dr Sperry's Result**

Swift's second reason for excluding Dr. Sperry's opinions is because Swift takes issue with Dr. Sperry's conclusions. Swift claims it is possible to have methamphetamine in a person's urine without there also being methamphetamine in that person's blood. Swift's belief is contrary to Dr. Sperry's testimony given at the Daubert hearing.

Swift's expert, Dr. Christopher Long, disagrees with Dr. Sperry opinions, specifically that there must be methamphetamine in Getchel's blood because there was methamphetamine found in her urine. Dr. Long also states there can be a safe level of methamphetamine found in a person's blood because it is prescribed by physicians for weight loss. Studies have shown that persons who abuse methamphetamine can ingest approximately 30 MG without showing signs of impairment. (Doc. 126, exh. A).

In essence, Swift argues that Dr. Sperry's opinions are inadmissible because Swift's expert refutes his opinions. Swift's arguments, however, do not tend to bear on the reliability or relevancy of Dr. Sperry's opinions, but whether or not they are correct. This is a classic case of "battle of the experts" and is best left to the trier of fact to determine how much weight to give to each expert's opinions. See, e.g., Watson v. United States, 485

-12-

F.3d 1100, 1110 (10th Cir. 2007); <u>Abilene Retail No. 30, Inc. v. Board of Com'rs of Dickinson County, Kan.</u>, 492 F.3d 1164, 1188 (10th Cir. 2007) (holding in a motion for summary judgment that "[t]he battle of the experts that the parties present to us requires a trial and a trier of fact to resolve."). The court will not focus on Dr. Sperry's conclusions, but on the methods utilized in reaching those conclusions. <u>Bitler</u>, 400 F.3d at 1233. Nor will the court credit one expert's opinion over another. <u>Watson</u>, 485 F.3d at 1110.

After performing its "gatekeeping" role, the court finds that Dr. Sperry's opinions are both reliable and relevant. Dr. Sperry is experienced in interpreting toxicology reports, he used scientifically valid methodologies, and reliably applied these methods to the facts of this case. Dr. Sperry's testimony will be helpful to the jury. Any dispute on Dr. Sperry's credibility or ultimate opinions can be addressed through cross examination at trial. Therefore, Dr. Sperry's opinions are admissible.

**IV. CONCLUSION**

Swift's motion to exclude the expert testimony of Dr. Sperry is DENIED. (Docs. 125, 126).

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise

-13-

available for presentation when the original motion was briefed or argued is inappropriate. <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

    IT IS SO ORDERED.

    Dated this <u> 10th </u> day of September 2008, at Wichita, Kansas.

                                       <u>s/ Monti Belot</u>
                                       Monti L. Belot
                                       UNITED STATES DISTRICT JUDGE